J-S49001-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.D.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 765 WDA 2020 |

Appeal from the Order Entered June 30, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000142-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 766 WDA 2020 |

Appeal from the Order Entered June 30, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000141-2019

BEFORE:   OLSON, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                    FILED JANUARY 08, 2021

_____

[*] Former Justice specially assigned to the Superior Court.

In this consolidated appeal,[1] Appellant, J.M., ("Mother") appeals from the June 30, 2020 orders[2] terminating her parental rights to her dependent children, M.M., a female child born September 2013, and Z.D.K., a male child born January 2015, (collectively, "the children"), pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[3]  We affirm.

The trial court set forth the following:

Mother [] is the parent of M.M. [] and [Z.D.K.], who have different fathers.  [The Allegheny County Office of Children, Youth and Families ("CYF")] had been involved with Mother for six years at the time of the termination proceedings.  The initial referral to CYF in April 2014[,] involved concerns that Mother lacked the ability to provide physical care of [M.M.], drug and alcohol [abuse] concerns, questionable parenting skills, and housing instability.  Through its investigation, CYF determined that Mother lacked housing stability, M.M. required treatment for thrush and a yeast infection, and the family needed food assistance.  CYF opened [] Mother's case for services on May 30, 2014[,] and [the case] remained open with Mother consecutively for the next six-plus years.

Prior to filing a dependency petition, CYF provided a multitude of services, including conferencing and teaming, a Pennsylvania Organization for Women in Early Recovery ("POWER") evaluation, crisis services through North Shore Community Alliance, in-home services through Life's Work of Western Pennsylvania, transportation assistance, in-home services through Three Rivers

_____

[1] In an August 17, 2020 per curiam order, this Court consolidated the two appeals sua sponte.

[2] The record demonstrates that the orders terminating Mother's parental rights were entered on June 30, 2020.  The caption has been corrected accordingly.

[3] The June 30, 2020 orders also terminated the parental rights of M.F.S.-M., the biological father of M.M., and the parental rights of J.E.K., the biological father of Z.D.K.  Neither of the biological fathers is involved in this appeal.

Youth, and in-home services through Homewood East Liberty area. [In January 2015,] Mother gave birth to [Z.D.K.] and continued to work with CYF [while] both children [remained] in her care[. H]owever, CYF found Mother's mental health, [the] domestic violence in her relationships, and her parenting skills of both young children to be troublesome. Due to Mother's lack of progress and CYF's increasing concerns, [CYF] filed petitions for dependency[,] and both children were adjudicated [dependent] on December 16, 2015. At the time of the adjudication hearing, Mother offered stipulations to mental health, parenting[,] and domestic violence concerns[,] and both children were permitted to remain in the care of Mother.

Mother's goals were to obtain and maintain housing, ensure the medical needs of the children, [obtain] parenting [skills], domestic violence treatment, [a] drug and alcohol evaluation and treatment, [and a] mental health evaluation and treatment, [submit to] random urine screens, and [] maintain her employment. CYF provided [M]other with a litany of services to assist Mother in meeting these goals[. S]pecifically, [the services included] ongoing conferencing and teaming, in-home services through Homewood East Liberty, services through the Women's Center, a POWER evaluation, family focus solution based therapy through Holy Family Institute, [a] referral to Urban League, an additional POWER referral, in-home services through Greater Valley, in-home services through Wesley Spectrum, [a] Section 8 referral and voucher, [aid through] the Project Rental Assistance program, and mental health services through Western Psychiatric Institute and Clinic. Notwithstanding the plethora of services provided over the next two years, CYF removed both children in November 2017, due to ongoing issues surrounding domestic violence, housing instability, mental health and a recent psychiatric hospitalization, and drug and alcohol concerns, including a positive screen [on] the day of the removal. CYF placed both children into the care of M.M.'s paternal grandmother.

With the children in foster care, CYF continued to make referrals and provide services so that Mother could address her family service plan goals. From the time the children were removed in November 2017[,] until [] CYF filed [petitions for] involuntary termination of parental rights [as to] both children in July 2019, CYF provided Mother with another Urban League referral, in-home services through Three Rivers Youth, [a] referral to Wesley Family for mental health, yet another Urban League referral, [a] referral to Shores, the Homebuilders intensive in-home services program,

mental health treatment through Turtle Creek Valley, another POWER evaluation, mental health services through Mon Yough Community Services, random urine screens, yet another Section 8 referral, and [a] referral for evaluations through the [trial court's] appointed evaluator. CYF also provided Mother with concrete goods in the form of food, hotel stays, financial assistance to get her [a Pennsylvania identification card] and [a copy of her] birth certificate, money for furniture, [financial assistance for] the security deposit for her electric [services], money for a stove, and financial assistance twice for a U-Haul, including one allocation for gas for the U-Haul. Mother's reunification goals remained substantially the same throughout this case, with the only addition being visitation once the children were removed in November 2017. CYF provided scheduled visitation to Mother[. H]owever, by the time of the termination proceedings Mother had not even achieved unsupervised visitation.

Trial Court Opinion, 8/24/20, at 4-8 (record citations omitted).

On July 29, 2019, CYF filed petitions for involuntary termination of Mother's parental rights to M.M. and Z.D.K. pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5), (a)(8), and (b). Raymond N. Sanchas, Esq., from the Allegheny County Office of Conflict Counsel, represented the legal and best interests of M.M. Frank B. McWilson, Esq., also from the Allegheny County Office of Conflict Counsel, represented the legal and best interests of Z.D.K. CYF was represented by Diann R. McKay, Esq. Jeffrey Eisenberg, Esq., represented Mother, and Rebecca Fenoglietto, Esq., represented the biological fathers of M.M. and Z.D.K. A termination hearing was held on March 2, 2020, and on June 25, 2020, at which the aforementioned counsel, as well as

Mother, M.F.S.-M., and J.E.K. participated.[4] On June 30, 2020, the trial court found that, with regard to Mother, CYF met its burden of proof under Sections 2511(a)(2), (a)(5), and (b) of the Adoption Act, and subsequently terminated Mother's parental rights to the children.[5] This consolidated appeal followed.[6]

Mother presents the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2), [(a)](5), and [(a)](8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Brief at 12.

_____

[4] The record demonstrates that the March 2, 2020 hearing was held in person. The June 25, 2020 hearing, however, was held virtually via Microsoft Teams due to the COVID-19 pandemic and the closure of the Court of Common Pleas of Allegheny County.

[5] The trial court found that CYS met its burden of proof under Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) with regard to M.F.S.-M., as the biological father of M.M., and under Sections 2511(a)(2), (a)(5), and (b) with regard to J.E.K., as the biological father of Z.D.K., and terminated their parental rights accordingly. Neither biological father filed an appeal.

[6] On July 24, 2020, Mother filed concise statements of errors complained of on appeal along with separate notices of appeal for each child pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court subsequently filed its Rule 1925(a) opinion on August 24, 2020.

In matters involving involuntary termination of parental rights, our standard of review is well-settled.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., 9 A.3d [1179, 1190 (Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (original brackets omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re Q.R.D., 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." In re B.J.Z., 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing

- 6 -

evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

B.J.Z., 207 A.3d at 921 (citation omitted). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re Z.P., 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re I.J., 972 A.2d 5, 9 (Pa. Super. 2009).

Here, Mother appeals the trial court's determination under Sections 2511(a)(2), (a)(5), and (a)(8).[7] See Mother's Rule 1925(b) Statement (M.M.), 7/24/20, at ¶ 1; see also Mother's Rule 1925(b) Statement (Z.D.K.), 7/24/20, at ¶ 1.

_____

[7] A review of the orders involuntarily terminating Mother's parental rights demonstrates that the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(2) and (a)(5) and did not terminate Mother's parental rights pursuant to Section 2511(a)(8). Therefore, we will consider Mother's first issue only as it relates to Sections 2511(a)(2) and (a)(5).

Sections 2511(a)(2) and (a)(5) provide as follows:

§ 2511. Grounds for involuntary termination

(a)   General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(2) and (a)(5).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his [,or her,] physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal[,] as well as incapacity to perform parental duties." In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In re Adoption of C.D.R., 111 A.3d 1212, 1216 (Pa. Super. 2015).

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

Z.P., 994 A.2d at 1117 (citation omitted). "[W]hen a parent has demonstrated a continued inability to conduct his[, or her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." Id. at 1118 (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." Id. (citation and original quotation marks omitted).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to

exist; and (3) termination of parental rights would best serve the needs and welfare of the child." Id.

Section 2511, in "permitting the termination of parental rights[,] outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated." Id. (citation and original quotation marks omitted).

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his[, or her,] ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs.

Id. at 1119. (citation and original brackets omitted).

Mother's argument, in sum, is that

> [i]nsufficient evidence was presented to support a determination that there was a continued incapacity of Mother to provide essential parental care for [M.M.] and [Z.D.K.]; that the conditions that led to the removal of [M.M.] and [Z.D.K.] from the care of Mother have not or cannot be remedied by Mother; that the conditions that led to the removal of [M.M.] and [Z.D.K.] still exist and cannot be remedied by Mother within a reasonable period of time; or, that termination would best serve the needs and welfare of [M.M.] and [Z.D.K.]

Mother's Brief at 30.  Mother contends that the trial court abused its discretion when it found that Mother's ability to fully comply with or complete her goals was clear and convincing proof that Mother had not remedied the conditions that led to the removal of M.M. and Z.D.K.  Id.  Mother asserts that although she did not submit to the drug and alcohol screenings as directed, due, inter alia, to her job and lack of transportation, she satisfied the drug and alcohol treatment goal by achieving sobriety.  Id. at 31.  Mother further asserts that although she did not attend mental health counseling as frequently or as consistently as directed, she achieved her mental health goal by no longer "self-medicating her panic by smoking marijuana."  Id.  Mother contends that there was no evidence that Mother's mental health or prior instances of domestic violence posed risks to M.M. or Z.D.K.  Id. at 32.  Mother also maintains that she has obtained appropriate housing.  Mother admits, that "[t]he evidence proved that Mother had not fully completed or complied with her court-ordered goals."  Id. at 33.  Mother argues, however, that "[t]he evidence clearly shows that Mother had made sufficient progress to remedy the conditions that caused [M.M.] and [Z.D.K.] to be removed from her care and that Mother was able to provide essential parental care."  Id.

CYF argues, that  the "evidence demonstrate[d] that Mother received an abundance of services since 2014[,] to help her address goals and remedy the conditions related to mental health, drug and alcohol [dependence/misuse], domestic violence, parenting[,] and establishing a stable, safe and secure environment for her children."  CYF's Brief at 27.  CYF

asserts that it provided Mother with "caseworkers, in–home service workers, [POWER] representatives, domestic violence, [substance abuse] and mental health counselors, [] transportation assistance, and housing services[,]" to assist Mother in achieving her goals. Id. at 33. CYF contends, however, that "Mother failed to cooperate fully with services, resisted or refused services[,] or just decided she did not have to do certain things, even if court-ordered." Id. at 31. As an example of Mother's continued inability to complete a goal, CYF explains,

> Despite housing assistance, Mother has not demonstrated that she can or will remain in appropriate housing or that she is able to provide a safe and stable home [] environment for her children. She spent at least a year, from Fall 2016[,] until November 2017, moving her children, on a weekly, if not a daily basis, from house to house. After the children's removal, it took her another [fifteen] months to obtain housing that she held for only six to seven months before returning to her transient pattern of living. Only on the eve of [the termination hearing], did Mother obtain housing, again. She has no track record to permit any assurance that she can[,] or will[,] maintain her housing.

Id. at 28-29.

The trial court found that the record unequivocally established Mother's unwillingness and inability to acknowledge and make the necessary progress in addressing her parental deficiencies that led to the children's dependency adjudication and ultimate removal. Trial Court Opinion, 8/24/20, at 8. In so finding, the trial court explained,

> Mother had a goal to obtain a mental health evaluation and treatment. Mother self-reported issues with anxiety and depression, which was supported in documentation received by CYF. CYF testified that Mother was asked to complete a mental

health evaluation and follow the recommendations for treatment. However, CYF testified that Mother's involvement in mental health treatment with the various providers she was referred to was inconsistent. Mother attended one appointment at Mercy Behavioral Health's dual diagnosis program; she attended two months of family focus solution based therapy through Holy Family [Institute] in June and July 2016; she participated in some services at Wesley Spectrum [] starting in September 2017[,] but documentation showed she was not in that program by January 2018; she had a voluntary admission to Western [Psychiatric] Institute and Clinic on October 23, 2017[,] for an attempted overdose; she reengaged with Wesley Spectrum for one appointment in August 2018; she had three scheduled appointments on May 10, 2019, July 5, 2019, and August 16, 2019[,] with Turtle Creek mental health that were not attended; [and] she attended an intake appointment at Mon Yough [Community Services] for mental health on September 13, 2019. At one point, Mother reported to CYF [that] she was taking psychiatric medication prescribed by her [primary care physician]. At the time of the termination proceedings, Mother did not document [a] completion of this [mental health] goal.

Mother had a parenting goal. CYF testified that they observed Mother to have poor planning skills [and] made [] choices that impacted her long-term ability to parent. CYF provided a number of in-home services through different providers to assist her in achieving this goal so that her children could return home. The Project Star supervisor of the intensive family services program, a program that provided direct services to Mother and her children from May 30, 2017[,] through May 31, 201[8,] provided testimony about their year-long involvement [with] Mother and the repeated concerns and deficiencies that were observed. [The] Project Star [supervisor] testified that [M]other was very disorganized, struggling to manage her paperwork and any required follow up. [The supervisor] reported that [Project Star] found Mother to have difficult[y] with problem-solving skills and she would refuse services or visits if "she wasn't in the mood and didn't want to be bothered or that she was sleeping and she'll text us when she felt like getting up." [The] Project Star [supervisor] testified that Mother did not make progress on the goals throughout the case despite a year of making countless efforts to try and engage [M]other and refer her to programs to address her goals. CYF continued to have concerns about Mother's abilities to provide for her children's basic needs, clothing, food, shelter[,] and medical

care[,] and [as a result of these concerns,] CYF provided concrete goods and referrals to help her become more effective as a parent in meeting her children's needs. Attendance at her children's medical appointments continued to be an issue after the children's [dependency] adjudication even though she was informed of these appointments by the CYF caseworker.

Mother had a goal to obtain a drug and alcohol evaluation, treatment, and submit to random urine screens. CYF testified that Mother's marijuana use predated [CYF's] involvement. CYF made four referrals for Mother to have a drug and alcohol evaluation through POWER, which recommended dual diagnosis treatment[. M]other attended two dual diagnosis sessions but did not complete either program. CYF also referred Mother for a drug and alcohol evaluation through the Shores program. Mother completed two intake appointments at Shores in May [2018,] and December 2018[,] with the expectation of continued treatment. However, Mother did not engage in any treatment after the May 2018 assessment and she attended one session but missed multiple other appointments after the December 2018 assessment. CYF testified that at the time the termination petitions were filed[,] there was no documentation that Mother had successfully completed her drug and alcohol goal, with her last known treatment in December 2018. The supervisor of the drug and alcohol screening program that CYF utilized to call Mother in for random urine screens also provided testimony. The drug screening supervisor reported that Mother's screens began on October 21, 2015[,] and that the last screen she was called in for was March 6, 2020. She testified that Mother was called in for forty-three total screens during that time period, completed twenty-three screens, and refused two screens. The drug screening supervisor testified that all of the twenty-three [urine samples] were positive for [tetrahydrocannabinol] and Mother's last positive urine screen was on May 22, 2019. CYF testified that they did not think Mother had fully addressed this goal based on her random urine screens and failure to complete recommended treatment from past evaluations. Mother testified that her last marijuana usage was in July 2019[,] and she was not presently engaged in any drug and alcohol treatment.

Mother had a goal to address domestic violence in her relationships. CYF testified that M.M. was present for at least one incident of intimate partner violence in May 2016. CYF stated that Mother [] obtained a temporary protection from abuse order against [Z.D.K.'s] father but did not follow through on obtaining a

final order.  CYF testified that they referred Mother to the Women's Center and Shelter for programming in June 2016.  At the time of the termination proceedings, CYF had not received any documentation from Mother that demonstrated that she [] successfully completed a domestic violence or intimate partner violence program.

Mother had a goal to obtain and maintain housing and employment.  At different times during [CYF's] multi-year involvement, Mother [] reported being employed at various jobs. Mother's housing instability continued to be problematic.  CYF referred Mother to the Urban League more than once and provided in-home services with a specific goal of locating and securing housing.  CYF testified that [Mother was] provided with a number of concrete goods, such [as payment of] the security deposit for [] electric [services], money for a stove, two allocations for U-Haul rentals[,] and one allocation for gas for the U-Haul.  Mother only obtained her most recent stable housing in February 2020.

When the children were placed into foster care in November 2017, [the trial c]ourt established a goal of visitation for Mother.  CYF testified that it was very challenging to set up a visitation schedule because of Mother's ongoing housing instability [and] because she had been moving from home to home with five different family members or friends.  Immediately after removal, Mother was to have unsupervised weekend overnight visits in her home once CYF had the ability to conduct a home assessment and background check.  CYF testified that there were concerns that Mother was continuing to struggle financially and provide for her children's basic needs during these visits.  CYF testified that from the time of removal in November 2017[,] until [CYF] filed the involuntary termination of parental rights petition[s] in July 2019, Mother attended thirty-two out of a possible seventy-one scheduled visits. Additionally, CYF testified that Mother would get upset during visitation "when she didn't get her way."

The foster care caseworker from A Second Chance, Inc. ("ASCI") also provided some insight on Mother's visitation.  The ASCI caseworker testified that she supervised a four[-]hour visit between Mother and the children in early July 2019.  [The caseworker] reported that Mother did not have any activities or meals organized for the children during this visit.  [The caseworker] stated that Mother did not really engage with [Z.D.K.] and when M.M. tried to get Mother to play with her that "the best mom kind of did was stay on the couch watching

[television] and help put clothes on the [Barbie dolls]." [The] CYF [caseworker] testified that Mother's last visit [with the children] was December 21, 2019, saying she [was] "taking care of her housing situation."

Mother's own testimony highlighted why continued progress was necessary to address the conditions that led to removal. Mother testified that [] she had difficulty attending urine screens because she was pregnant, several centimeters dilated, and due in approximately two weeks. Mother was still seeking reunification with M.M. and [Z.D.K.] when she testified at the termination proceeding. Mother stated that she did not think it would be difficult ("No, it's not, and I'm pretty confident on that") for her to take care of the older children, who had not been in her care for two and a half years, while also parenting a child under one year [of age] and a newborn.[FN4] When pressed about how much longer she needed to complete her goals, nearing five years of involvement with CYF and two and a half years of her children in foster care, Mother testified, "It's not going to be much longer" but earlier in her testimony stated, "I literally just started everything again."

> [FN4] Referenced in Mother's testimony on June 25, 2020, Mother's third child was ten months old. This child does not share a father with either M.M. or [Z.D.K.,] and this child is not the subject of any proceedings or supervision by [the trial c]ourt.

Here, despite the ample time [the trial c]ourt allowed in an effort to afford this young Mother an opportunity to remedy the conditions that led to the removal. Mother regrettably was unable to make the progress necessary to achieve reunification. [The trial c]ourt notes that there were periods of time over the five plus years where Mother was able to demonstrate some small spells of cooperation and nominal growth on her part. However, Mother's own testimony demonstrated her inability to truly comprehend the posture of this case. Simply put, there was no competent evidence or testimony presented that Mother could or would be able to soon demonstrate, with any degree of confidence, the ability to provide proper parental care and control of these two children.

Id. at 10-15 (record citations omitted).

"This Court need only agree with the trial court's decision as to any one subsection [of Section 2511(a)] in order to affirm the termination of parental rights." In re A.S., 11 A.3d 473, 478 (Pa. Super. 2010) (citation, original brackets, and original quotation marks omitted). Accordingly, we focus our review in the case sub judice on Section 2511(a)(2).

Here, the record demonstrates that CYF became involved with Mother in May 2014, over concerns for inadequate physical care, lack of parenting skills, inability to provide basic care, Mother's drug and alcohol misuse, and Mother's lack of stable housing with regard to M.M. N.T., 3/2/20, at 9-10. After Z.D.K.'s birth in January 2015, CYF's aforementioned concerns continued as to both children and further included concerns for Mother's mental health, domestic violence issues, and leaving the children alone or with inappropriate caregivers for extended periods. Id. at 13-14. Both children were adjudicated dependent in December 2015, but remained in Mother's custody, provided that Mother achieved the goals set by CYF, which included, inter alia, to obtain a drug and alcohol assessment and treatment, attend domestic violence treatment, including obtaining a protection from abuse order against Z.D.K.'s biological father, attend mental health treatment, complete parenting classes, and ensure that the children attended their medical appointments. Id. at 15-16. Mother was provided with several services to help her achieve her goals, including, inter alia, in-home services, mental health services, and women's crisis services. Id. at 17. In November 2017, the children were removed from Mother's custody due to Mother's housing instability, as well as

continued concerns for Mother's mental health, domestic violence, and drug and alcohol issues. Id. at 18-19. After the children's removal from Mother's custody, Mother was provided with numerous services to assist Mother in achieving her reunification goals, including, inter alia, mental health services, parenting skills services, treatment for drug and alcohol abuse and for domestic violence issues, as well as financial assistance for food and housing needs. Id. at 19-20.

At the time the petitions for termination of Mother's parental rights ("termination petitions") were filed in July 2019, Mother failed to complete a drug and alcohol treatment program or to document that she was engaged in active services for drug and alcohol treatment. Id. at 27. As part of her drug and alcohol treatment goal, Mother was asked to participate in 43 urine screenings, of which Mother attended 23 procedures. Id. at 29; see also N.T., 6/25/20 (Vol. 2), at 16. Mother tested positive 16 times for drug and alcohol use. N.T., 3/2/20, at 30; see also N.T., 6/25/20 (Vol. 2), at 16. Mother reported that her last drug use was July 2019 and that she was not currently engaged in a drug and alcohol treatment program. N.T., 6/25/20 (Vol. 2), at 28, 118. At the time the termination petitions were filed, CYS concluded Mother had not met her drug and alcohol goal. N.T., 3/2/20, at 30.

Mother's mental health goals included participation in family focus solution based therapy, obtaining an updated mental health evaluation, and attending mental health treatment programs. Id. at 34. While the children were still in Mother's custody, Mother attended one behavioral health

appointment, participated in family focus solution based therapy in June 2016, and July 2016, and participated in mental health treatment services at Wesley Spectrum Services starting in September 2017, but was no longer participating in those services as of January 2018. Id. 35-37. Mother attended one additional service appointment with Wesley Spectrum Services in August 2018. Id. at 38. Mother had similar services provided by Turtle Creek Valley, but she failed to attend any of her three scheduled appointments. Id. After the termination petitions were filed, Mother had an intake appointment with Mon Yough Community Services in September 2019. Id. at 39. Mother also had a mental health assessment done during her voluntary admission into a psychiatric clinic after she attempted to overdose. Id. at 39, 159. Since the filing of the termination petitions, Mother has been unable to document consistent participation in a mental health treatment program and has not met her mental health goal. Id. at 41, 159.

Mother had a domestic violence treatment goal stemming from her reported instances of domestic violence involving, separately, both biological fathers and two other paramours.[8] Id. at 43. As part of her treatment, Mother was referred to a women's crisis center but she attended only two of the eight sessions. Id. at 45. Since the children were removed from Mother's custody,

_____

[8] Since its involvement, CYF noted that Mother reported three instances of domestic violence and one instance of a verbal argument that did not escalate to the point of violence. N.T., 3/2/20, at 44. M.M. was present for one instance of domestic violence in May 2016. Id.

however, CYF is unaware of any further instances of domestic violence and this goal is no longer a concern for CYF. Id. at 53. Mother reported that her last episode of domestic violence occurred in 2018, and involved an ex-boyfriend, who was unrelated to the children. N.T., 6/25/20 (Vol. 2), at 27.

Mother's goal of demonstrating improved parenting skills stems from CYF's concern over Mother's "[g]eneral lack of organization and planning, [her] leaving [of the] children alone or with inappropriate caregivers, [her] leaving [the] children with other caregivers for extended periods of time, [and Mother's] inability to handle doctor appointments for the children." N.T., 3/2/20, at 58. Despite Mother's receiving in-home services provided by several agencies, CYF has not observed significant or sufficient change in Mother's lifestyle to support a recommendation that the children be returned to Mother. Id. at 64-65. Mother is not currently working with an in-home service provider. N.T., 6/25/20 (Vol. 2), at 95. Mother failed to attend most of the children's scheduled medical and school appointments, despite receiving notification of the appointments from CYF. N.T., 3/2/20, at 65-67, 85. Mother's housing situation has been unstable, with a brief period where Mother has been able to achieve her own housing. Id. at 67-69, 85. Mother received assistance to aid her in achieving her goal of obtaining housing, including, inter alia, housing vouchers, payment for hotel stays, and payment of utility security deposits, and moving expenses. Id. at 68-69. Mother stayed with friends or family and moved around frequently, which made it

difficult for CYF to contact Mother to arrange visitation. Id. at 70-73, 149-157; see also N.T., 6/25/20 (Vol. 2), at 123-125. From June 2018, until the filing of the termination petitions in July 2019, CYF scheduled 71 visits between Mother and the children, of which Mother attended 32. N.T., 3/2/20, at 76. Mother admitted that, in September 2016, she asked M.M.'s paternal grandmother to care for the children "because [Mother was not] in a position to take care of [her] children." N.T., 6/25/20 (Vol. 2), at 24.

Dr. Terry O'Hara, PhD., a licensed psychologist, stated that he had "concerns with regard to [Mother] at the time of [his] evaluation in November 2019." Id. at 39. Specifically, he stated he was concerned that Mother lacked housing, acknowledged a history of homelessness and a history of what was referred to as affective instability, and reported depression, including an attempted suicide two years prior, anxiety, and panic attacks. Id. at 39-40. Dr. O'Hara opined, that "it would be difficult to provide safety, stability[,] and security to children without adequate housing." Id. at 44. In discussing the effects that housing instability has on children, Dr. O'Hara proffered, that "[w]hen there[ is] significant disruption to one's educational routine and situation, that can have a negative effect on kids developmentally." Id. at 45.

Based upon our review of the record, we concur with the trial court that "there was no competent evidence or testimony presented that Mother could or would be able to soon demonstrate, with any degree of confidence, the ability to provide proper parental care and control" for the children. See Trial

Court Opinion, 8/24/20, at 15. Mother admits that "[t]he evidence proved that Mother had not fully completed or complied with her court-ordered goals." See Mother's Brief at 33. Mother testified that she is not currently working with in-home services on parenting skills and is not currently engaged in mental health treatment. N.T., 6/25/20 (Vol. 2), at 95, 97. When asked how much longer she needed to achieve her goals, Mother responded, "It's not going to be much longer." N.T., 6/25/20 (Vol. 2), at 118. Mother explained that her objective was not to have M.M. placed with her, but to retain her parental rights in order to visit and maintain contact with M.M. Id. at 120. The record further demonstrates Mother's history of transient living, her failure to accept or follow-through with service programs designed to aid her in obtaining stabile housing, and that she only recently obtained her current housing in February 2020. Id. at 122-128; see also N.T., 3/25/20, at 164.

The record demonstrates clear and convincing evidence of Mother's repeated and continuing incapacity to meet her goals that lead to the removal of the children from her care, including, inter alia, unstable housing and mental health treatment, that Mother's incapacity to meet her goals led to the children being without parental care and subsistence, including a safe, secure, and permanent environment in which to grow, and that it is unlikely Mother will remedy the situation given CYF's extensive history of providing services and aid to Mother with only inconsistent and sporadic progress in achieving her goals. We discern no abuse of discretion or error of law in the trial court's determination to terminate Mother's parental rights to M.M. and Z.D.K.

pursuant to Section 2511(a)(2). Mother's first issue, therefore, is without merit.

Mother's second issue challenges the trial court's determination that there was clear and convincing evidence that involuntary termination of Mother's parental rights would best serve the developmental, physical, and emotional needs of the children. Mother's Brief at 34-37.

Once the trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), the trial court is required to engage in an analysis pursuant to Section 2511(b) to determine whether termination is in the best interests of the child. Section 2511(b) states,

§ 2511. Grounds for involuntary termination

. . .

(b)  Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(b). The analysis under Section 2511(b)

focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [Section] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law,

- 23 -

however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [Section] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of J.N.M., 177 A.3d 937, 943-944 (Pa. Super. 2018) (citation and original brackets omitted), appeal denied, 183 A.3d 979 (Pa. 2018). A trial court may rely on a caseworker or social worker to determine the status of and nature of a parent-child bond. J.N.M., 177 A.3d at 944 (holding, a trial court "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert" (citation omitted)); see also In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005) (holding, a trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond" (citation omitted)).

Here, Mother argues that an interactional evaluation between Mother and the children was "needed for Dr. O'Hara to provide an expert assessment of the impact that termination of Mother's parental rights would have on" the children. Mother's Brief at 35. Mother believes that termination of her parental rights is not in the best interests of the children because termination

would "unnecessarily and permanently deprive [M.M.] and [Z.D.K.] of the relation[ship] not only between [M.M.] and [Z.D.K.] and Mother, but also between [M.M.] and [Z.D.K.] and their siblings[9] and maternal relatives." Id. at 36. Mother also contends that the trial court erred in determining that termination of Mother's parental rights to Z.D.K. would provide permanence for Z.D.K. because Z.D.K. has only been in his current placement for four months and an interactional evaluation between Z.D.K. and his new caretakers was not performed. Id.

In determining that the "evidence firmly establishe[d] that termination [of Mother's parental rights would] provide both children with much needed stability and permanence" and would best serve the "developmental, physical[, and] emotional needs and welfare of these children[,]" the trial court explained,

> severing the bond between these children and their Mother would not cause extreme emotional consequences for either child, and any negative consequences would be mitigated by the established bond M.M. had with her paternal grandmother and the increasing attachment and overall strides [Z.D.K.] was making in his foster home. Mother had not visited these children for months leading up to the involuntary termination of parental rights proceedings. While the [trial court does not] doubt that Mother still loves these children, it is [the trial court's] opinion that any attachment these children had with their Mother was adversely impacted due to Mother's lack of consistent and meaningful contact over the last two and a half years.

_____

[9] Mother currently has two other children who are the half-siblings of M.M. and Z.D.K.

Trial Court Opinion, 8/24/20, at 21. The trial court found that Dr. O'Hara was unable to assess Mother's bond with the children because, of the three interactional evaluations scheduled, an evaluation was unable to be performed.[10] Id. at 20.

The record reflects that when asked about her relationship with Mother by Dr. O'Hara, M.M. responded, "Bad. Just bad" but M.M. was unable to provide Dr. O'Hara with any examples as to her basis for this statement. N.T., 6/25/20 (Vol. 2), at 55-56, 78. Dr. O'Hara reported that M.M. "characterized herself as happy" and that she was positive about her living environment with her paternal grandmother. Id. at 54-55, 88. Dr. O'Hara opined, that "due to both children's ages, permanency was urgently important to them to develop mentally" because developmental needs of a child are dependent upon the child being in a secure, safe, and stable environment in order to have a sense of trust upon which to build positive relationships. Id. at 53-54. When asked about the parent-child bond between Mother and each of the children, Dr. O'Hara remarked that he was unable to provide an assessment without conducting an "interactional evaluation, as well as observing parenting skills

_____

[10] The trial court found, "Mother came late to the November 2019 interactional [evaluation] and the children had already been transported back to their foster homes, at the rescheduled interactional [evaluation] in December 2019[,] the children were not transported [to the evaluation site], and Mother failed to show for the third [interactional] evaluation scheduled in February 2020." Trial Court Opinion, 8/24/20, at 20; see also N.T., 6/25/20 (Vol. 2), at 36-37.

[and] observing the children's comportment toward [Mother,]" which he was unable to conduct. Id. at 49-50, 73.

Kim Lincoln, the children's caseworker from September 2019, until early June 2020, observed that M.M. was very comfortable being with her paternal grandmother and that she considered her grandmother's house her home. N.T., 6/25/20 (Vol. 1), at 11. M.M. shared the interest of dance with her grandmother and both engaged in at-home activities, such as baking, cooking, and gardening. Id. at 11. Lincoln reported that M.M. did not want to visit with Mother, and M.M.'s feelings towards not visiting with Mother "just grew stronger" during Lincoln's bi-monthly visits with M.M. Id. at 12. Lincoln stated that M.M. expressed that she wished to be adopted by her paternal grandmother. Id. at 40.

With regard to Z.D.K., Lincoln described Z.D.K. as "[v]ery, very happy" in his current placement home.[11] Id. at 14-16. Lincoln stated that Z.D.K. did not talk much about Mother, other than about the idea of a visit with Mother so he could play video games at her house. Id. at 17-19. When asked, Z.D.K. indicated that he wanted to continue living in his current placement home even if his friend no longer lived there. Id. at 32, 50. Lincoln described Z.D.K. as "well-bonded" with his current caregiver. Id. at 38. Lincoln's assessment

_____

[11] The record reflects that Z.D.K. was originally placed in the care of M.M.'s paternal grandmother, but was removed in February 2020, and placed in the foster home where one of Z.D.K.'s friends resides. N.T., 6/25/20 (Vol. 1), at 12-13.

was further confirmed by Maurisa Vorbach, a CYF caseworker, who observed positive interaction between Z.D.K. and his current caregiver. Id. at 45-47.

Lincoln reported that Mother's last visit with the children was in December 2019, and that until the restrictions limiting in-person visits due to the COVID-19 pandemic were implemented, Mother had only confirmed one visitation in January 2020, which was cancelled by Mother while the children were en route to the visitation site. Id. at 18, 23. Mother only participated in one virtual visit with the children after the COVID-19 restrictions were implemented. Id. When asked to describe her general observations of Mother's parenting skills and her interaction with the children during a June 2019 visitation, Lincoln stated,

> [Mother] really [did not] have anything [] organized for the [children] in terms of activities or meals. [Z.D.K.] was excited by a few of the boy toys that were there and he kept bringing them over to [Mother]. [Mother] did have a baby she was taking care of at the time, but she really [did not] engage with [Z.D.K. There] was someone staying at [Mother's] house who she got to bring down the Barbie Dreamhouse for the [children] to play with. [M.M.] got excited about that and tried to get [Mother] to play with her[. T]he best [Mother] kind of did was stay on the couch watching [television] and help put clothes on the [Barbie dolls].

Id. at 21 (paragraphing omitted).

Based upon a review of the record, we find clear and convincing evidence to support the trial court's conclusion that termination of Mother's parental rights to M.M. and Z.D.K. serves the best interests of the children. See In re G.M.S., 193 A.3d 395, 402-403 (Pa. Super. 2018) (stating, "a child's life cannot be held in abeyance while a parent attempts to attain the

maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." (citation and original quotation marks omitted)). The evidence supports that any limited parent-child bond that may have existed between Mother and each of the children was adversely affected due to Mother's "lack of consistent and meaningful contact[,]" Mother's inability to provide a safe, secure, and stable environment in which the children could grow, and Mother's lack of parenting-skills. Moreover, the record supports that the current caregivers of M.M. and Z.D.K. are in the best positions to satisfy the safety, security, and stability needs of the children. Therefore, we discern no abuse of discretion or error of law on the part of the trial court in concluding that termination of Mother's parental rights to M.M. and Z.D.K. is in the best interest of each of the children.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/2021